**MALCOLM B TEBBS, Plaintiff**
**v.**
**ALCOA STEAMSHIP COMPANY, INC.,**
**Defendant**

## Civil No. 164-1954
## District Court of the Virgin Islands

Div. of St. Thomas and St. John
at Charlotte Amalie

## March 1, 1956

*See, also, 139 F. Supp. 56*

*Same case on appeal, see p. 592 this volume*

DUDLEY, HOFFMAN & McGOWAN, Charlotte Amalie, Virgin Islands, (GEO. H. T. DUDLEY, ESQ., of counsel) *for plaintiff*

MAAS & BAILEY, Charlotte Amalie, Virgin Islands, (WILLIAM W. BAILEY, ESQ., of counsel) *for defendant*

MOORE, *Judge*

This matter came on for hearing on the 21st and 24th day of October, 1955, with the court sitting as a jury, and with all parties represented by counsel: the plaintiff, Malcolm B. Tebbs by Dudley, Hoffman and McGowan, Geo. H. T. Dudley, Esquire, of counsel; the defendant, Alcoa Steamship Company, Inc., by Maas and Bailey, William W. Bailey, Esquire of counsel.

This is an action of tort for personal injuries resulting to the plaintiff, caused by the alleged negligence of the above-named defendant, and for which injuries plaintiff demands judgment against defendant in the amount of $20,000, together with costs and disbursements of this action, including reasonable attorneys' fees.

The plaintiff, by way of complaint, alleges that on December 14, 1953, he visited the offices of the defendant, on business, at which time he was using crutches occasioned by his having suffered a comminuted fracture of the lower one-third of the left femur on September 17, 1953, and from which injury he had almost completely recovered; that he was using crutches because he could not yet put his left foot to the ground and needed them to maintain his equilibrium in walking. That upon his visit to the general office of the defendant he was interviewed by Mr. Vincent Wallace, manager, and another employee of the defendant; that he was invited to enter a vestibule leading to the private office of Mr. Wallace and that immediately upon entering said vestibule leading to the manager's office, "plaintiff placed his crutches upon the floor of said vesti-

bule, whereupon said crutches skidded outward by reason of the floor having been recently oiled or caused to be oiled at the instance of defendant, its agents and employees; that plaintiff was caused to be thrown to the floor, without any fault on the part of plaintiff contributing thereto, and solely through the negligence of defendant, its agents and employees as aforesaid," and from which injury he suffered an additional fracture of the left femur, necessitating a return to the hospital and further preventing him from resuming the practice of his legal profession, for all of which he has suffered great pain of body and mind, and for which he now claims damages as heretofore expressed.

The Court heard the evidence and at the conclusion of the plaintiff's case, counsel for the defendant moved the Court to dismiss the action which motion was denied. Thereupon, defendant rested on the evidence as submitted by the plaintiff, calling no witnesses in its behalf, and moved for a finding in favor of the defendant on the ground that there was no negligence on the part of the said defendant.

At the direction of the Court, briefs were submitted by both sides. The Court has read the briefs herein and has heard the oral argument upon the same.

The evidence adduced at the trial discloses that the plaintiff is a man of some fifty-three years of age, over six feet in height, over two hundred pounds in weight and, at the time of the accident, was on crutches, the result of a previous injury involving a fracture of his left femur on September 17, 1953, but from which injury he had almost completely recovered.

Plaintiff who is an attorney in the Virgin Islands testified that at about 11:00 a.m., on the morning of December 14, 1953 he had occasion to visit the offices of the defendant in Charlotte Amalie, St. Thomas, Virgin Islands, on business. That the aforesaid offices are located on the

second floor of an office building here in Charlotte Amalie; that it was a bright and clear day; that he walked up some fifteen to eighteen stone steps leading up from the ground floor, then to a level platform, and from there into the left hand room which is known to be the main office, or waiting room, where customers doing business with defendant enter and transact their affairs at a counter provided for that purpose. Plaintiff testified that while discussing his business with an employee of defendant at the aforesaid counter, Mr. Vincent Wallace, the local manager of the said Alcoa Steamship Company, Inc., came into this outer office and recognizing the plaintiff with whom he had previously done business, and seeing that he was upon crutches, thereupon invited plaintiff to come to his private office where he would be more comfortable.

On direct examination plaintiff testified as follows:

"Q. Now, what did Mr. Wallace say to you? A. Well, he bid me the time of day. He was very courteous and we started to discuss the matter of business that I had, and then Mr. Wallace said: 'Mr. Tebbs, if you will come into my private office, I believe you can sit down and be more comfortable.' That is verbatim what he said.

"Q. Did he indicate how you were to get to his private office? A. Yes, sir. He said, 'go out in that waiting room to the outside and come in through the vestibule. I will go around. I will open the door for you so you can get in.' The door was locked.

"Q. And when you arrived at the area marked 'B', what happened? A. Immediately upon my reaching the entrance of the vestibule, my crutches skidded outward on both sides and I fell to the floor immediately.

"Q. Now, when you reached the door to what you call this vestibule, had Mr. Wallace arrived at the door from the inner office? A. Simultaneously.

"Q. So he actually saw you fall? A. He opened the door as I fell at almost one and the same time. As he opened the door my crutches were put on this oiled floor and I fell.

"Q. Can you describe to us what kind of flooring it was? What kind of cover it was? A. Linoleum.

"Q. And was there anything about that linoleum which indicated to you or warned you that it was oiled? A. Definitely, there was no warning at all. I assumed when I was invited in, it was a safe place for me to walk.

"Q. So that until your crutches skidded from under, you had no knowledge or notice that it was oiled? A. No, sir. I did not have an opportunity to make one step.

"Q. In what manner did they slip? A. Each one went out — outward.

"Q. And after you fell, did you examine the floor to determine whether it was oiled or not? A. Yes, sir. I did. It was called to my attention by Mr. Wallace.

"Q. What did Mr. Wallace say to you? A. He said immediately: 'The boy has just oiled the floor' ".

Terrence Brady, plaintiff's man-servant, was called as a witness and stated that there was "a linoleum on the floor; a brown linoleum on the floor" upon which plaintiff fell.

The significant portion of this witness' testimony is herewith quoted:

"Q. Was there any mark left on the floor as a result of this fall? A. From the tip of the crutches it leave like a streak across the floor.

"Q. Did you notice anything on the floor which to you seemed peculiar. A. On the floor it would seem to be wet with oil.

"By the Court:

"Q. You say 'seem to be'? A. Yes, sir.

"Q. Are you sure whether it was or it was not? A. To me it was wet with oil.

"Q. Did you feel it or anything? A. I stepped on it and slipped on it giving Mr. Tebbs assistance when he fell.

"Q. What happened when you stepped on it? A. It was slidy. It leave a film on my hand."

Also Emile King, a patrolman, who came to defendant's office in search of a taxi cab chauffeur charged with some infraction of the parking law, was present at the time and saw plaintiff as he was in the process of falling to the floor. The officer testified that the floor "had linoleum on it" and, also, that "it look like it had oil on it." The significant part

of his testimony, however, is that "I slid on it my own self with my own shoes". Counsel for plaintiff then asked the witness if he had seen any marks on the floor as a result of the fall, to which he replied: "The crutch themselves show a long mark about four to five feet and a half on both sides; on the side of the crutches. It had a long white streak mark through the oil where, apparently, you see he slid down on the lineoleum."

Thus, in addition to the plaintiff himself, two other witnesses testified as to the slippery condition of the floor, and all three persons in succession slipped on it. There was sufficient of it to be seen and felt which is evidence attesting to an unsafe condition.

In addition to the above testimony of these witnesses, there is the undisputed comment of the manager who had invited plaintiff to come through this vestibule to his private office, to wit: that "the boy had just oiled the floor." It has not been contradicted that defendant's employee or manager knew that this floor had been recently oiled, or that it was still wet and slippery from the oiling as shown by witnesses Brady and King. The manager was aware of the fact that plaintiff was on crutches, and defendant was obligated to maintain the premises in a reasonably safe condition for plaintiff's use in accordance with the invitation.

In Judson v. American Ry. Express Co., 242 Mass. 269, 136 N.E. 103, the court said: ". . . the plaintiff was rightfully in the defendant's office by invitation and it owed her the duty to maintain the premises in a reasonably safe condition for her use in accordance with the invitation. She could properly assume that the floor was safe for her to walk upon. The fact that she did not observe its condition before she fell is not conclusive against her right to recover . . .. From the fact that she did not look at the floor until after she fell, it could not have been ruled that she was careless; she was not bound to keep her eyes

upon the floor before her." Woods v. City of Boston, 121 Mass. 337; Hendricken v. Meadows, 154 Mass. 599, 28 N.E. 1054; McDermott v. Sallaway, 198 Mass. 517, 85 N.E. 422, 21 L.R.A. (n.s.) 456; Marston v. Reynolds, 211 Mass. 590, 98 N.E. 601; Blease v. Webber, 232 Mass. 165, 122 N.E. 192; St. 1914, c. 553.

In the foregoing case the court also said: ". . . by reason of the washing and without sufficient time having elapsed for the floor to become dry, it was in a slippery and dangerous condition to walk upon, and that in the exercise of reasonable care for the safety of those who were rightfully on its premises the defendant should have given them some warning to prevent injury." Hendricken v. Meadows, supra; Blease v. Webber, supra; Kingston v. Boston Elevated Railway Co., 207 Mass. 457, 93 N.E. 573; Foley v. J. R. Whipple Co., 214 Mass. 499, 102 N.E. 84; Letchworth v. Boston & Maine Railroad, 220 Mass. 560, 108 N.E. 500. See also Headington v. Central Bldg. Co., 137 Kan. 350, 20 P.2d 816; Phillips v. Commercial National Bank, 119 Kan. 339, 342-346, 239 Pac. 984 and syl-par. 1. See, also, Robinson v. F. W. Woolworth Co., 80 Mont. 431, 261 Pac. 253; John Gerber Co. v. Smith, 150 Tenn. 255, 263 S.W. 974; Rothschild v. Fourth & Market Street Realty Co., 139 Cal.App. 625, 34 P.2d 734.

Defendant's contention is that the mere oiling of the floor upon which the plaintiff fell is not ipso facto negligence, and that the defendant is not an insurer of its invitees in its place of business. With both of those arguments this court is in full agreement, so far as they are applicable in the instant case, but the evidence in this case seems to go much further.

The defendant has cited the case of J. C. Penny Co. v. Robison, 1934, 128 Ohio St. 626, 193 N.E. 401, 100 A.L.R. 705, and has shown the application of that doctrine down

through numerous citations. The plaintiff has cited the case of Bury v. F. W. Woolworth Co., 1930, 129 Kan. 514, 283 Pac. 917, and has shown the application of its doctrine down through numerous citations. The well written briefs on both sides show an impressive array of cases for each. However, upon an analysis of the facts as shown from the evidence in this case, there is a much stronger showing of negligence than those in either of the above line of cases.

■ The court is of the opinion that the uncontradicted facts adduced, unequivocably points to defendant's knowledge and allowance of this "slippery" condition to exist in this passageway, and the manager's invitation to plaintiff whom he knew was in an already disabled condition and using crutches to enter it was clearly negligence toward the invitee.

■ The argument raised by defendant that eleven other persons who afterwards walked over the identical passageway, including the stretcher bearers, the doctor, and attendants, who did not fall, is not significant or even material, for the reason that these men had already been put on notice as to the unsafe condition of the premises after three persons had slipped on it in succession and, naturally, would be on the lookout. The plaintiff, however, was unquestionably caught by surprise, for he had no knowledge of the existing dangerous condition of the floor, or he would have been hesitant to venture this crossing unattended, especially so when he had employed Terrence Brady for the very purpose of assisting him in negotiating places which would jeopardize his safety and which he could not, on his own power, traverse safely.

The Court is of the opinion, therefore, that the defendant was negligent in the circumstances as stated above, and that the plaintiff should recover for the injury sustained.

We come, therefore, to the question of the measure of the plaintiff's damages.

Dr. Peter D. Sabatelle, Orthopedic Surgeon and Consultant, who attended the plaintiff, both at the original injury and the re-fracture presently complained of, was called to explain the damage suffered and the nature and extent of any possible future permanent disability as a result of the re-fracture complained of in this case.

The medical testimony disclosed that plaintiff, by reason of the fall on December 14, 1953, had re-fractured the left femur and, as a consequence of which, was hospitalized for five days during which time he was put under traction, then a hip cast was applied. Following plaintiff's discharge from the hospital, he was taken to his home where he was immobilized for an additional eight weeks until the cast was removed on February 14, 1954. He was then ordered to wear a brace and use crutches which he did continuously until April 1954, and thereafter intermittently until September 1954; that he was totally disabled for a period of about four months and partially disabled for a total of nine months all together. The doctor pointed out that plaintiff had suffered a ten per cent deviation in extension and a thirty per cent disability or impairment of the left leg. The deviation in flexion, however, which is a diminution of the angle between the bones was negligible, but would in some measure preclude plaintiff from resuming the normal physical activities such as walking or riding without discomfort for some indeterminate time hereafter.

In his testimony that there remains a thirty per cent permanent disability in the left leg, and that this permanent disability is due entirely to the re-fracture in this case, Dr. Sabatelle presented several X-rays, together with the results of his physical examination of the plaintiff, both of which were made just prior to this accident of December 14, 1953 and which showed a complete healing of the bones from the previous fracture. He also testified of his examination of plaintiff's extension and flexion just prior to this

accident, that they were perfectly normal from the first fracture and that no disability was left as a result of this first fracture. He then presented X-rays which were taken after he was recalled as a result of the present re-fracture and, finally, the result of examinations and X-rays taken after the healing of this second fracture. His testimony was clear and undisputed that the partial permanent disability to the leg was totally a clear and direct result of the second fracture and not of the first. There was no contradiction whatever of this medical testimony.

■ It is not disputed in the evidence that the plaintiff's doctor's bills for this accident was the sum of $1,183, and that the same was reasonable. Plaintiff has submitted testimony also of his loss of income as an attorney during the time that he was incapacitated by reason of this re-fractured femur. However, this court is of the opinion that since the evidence of that loss of income is indefinite, but leaves that loss of income to be estimated by the Court, this court has no measure by which to estimate that loss. There is no doubt in the Court's mind that plaintiff sustained loss of income, but there is no way for the Court to fix that amount and the Court is of the opinion that it cannot speculate or estimate it. Consequently, no sum can be fixed and nothing can be allowed for loss of income.

Plaintiff has also claimed an expert witness fee of $150 and, upon the day of the oral argument of the case, presented the bill to the Court. The bill was not presented in evidence at the time of the trial of the case, and was not testified to by any witness at that time. Consequently, it must be disallowed.

However, as to the damages for disability and pain and suffering sustained as a result of this accident, the medical testimony in this case is much clearer than in the average case, for the doctor has clearly specified the distinction between the damage of the original fracture and the damage

caused by this re-fracture, and by reason of the complete healing of the original fracture, leaving no disability, X-rays of the re-fracture caused by this accident which did leave certain disability, this court is able to determine with certainty the extent of permanent injury resulting from the accident in this case. The Court is able to determine the length of time that it was necessary for the plaintiff to have his leg in cast; the period of permanent and partial disability, and the pain and suffering caused in this case, as well as the extent of his recovery from the second accident and the extent of the permanent injury to the knee.

■ The Court has considered all of the testimony very carefully and is of the opinion that the fair measure of the plaintiff's damages for temporary disability, and pain and suffering, together with permanent injury should be assessed at the sum of $10,000. Also, as a result of this accident plaintiff has sustained damages in the sum of $1,183 as out of pocket doctor's bills, or a total of $11,183 as damages.

■ Under the statute in this jurisdiction allowing the Court to fix attorneys' fees, the Court also feels that $1,500 is a reasonable attorney's fee in this instance and, therefore, is part of the costs herein.

Judgment therefore should be for the sum of $11,183, plus $1,500 attorneys' fees, or a total of $12,683, together with the filing costs of the action.

Order may be drawn in accordance therewith.